UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 1:18 CR 00131 |
| v. | JUDGE JOHN R. ADAMS |
| DAVID M. RICHARDS, | |
| Defendant. | |

**Government's Response to Defendant's Motion to Reduce Sentence
Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i)**

Defendant David M. Richards (Richards) has filed a motion asking this Court to reduce his sentence of imprisonment under 18 U.S.C. § 3582(c)(1)(A)(i) and order his immediate release, relying on the threat posed by the COVID-19 pandemic. [R. 52]. Richards, who is incarcerated at FCI Elkton, asserts that he developed hyperlipidemia in prison, and has gastro-esophageal reflux disease, osteopenia, major depressive disorder, elevated blood pressure, pre-diabetes, and obesity. He argues that his medical conditions put him at a greater than normal risk of suffering serious symptoms should he contact the COVID-19 virus. Thus, he seeks a sentence reduction of credit for time served. The United States respectfully opposes the motion because the 18 U.S.C. § 3553(a) factors do not support the requested relief.

I.      **Procedural Background**

On May 22, 2018, Defendant pled guilty with a Plea Agreement to Count 1, Receipt and Distribution of Visual Depictions of Real Minors Engaged in Sexually Explicit Conduct, in violation of 18 U.S.C. § 2252(a)(2). The parties agreed that Richards' prior conviction for Gross Sexual Imposition (F-4) did not result in an enhancement of Richards' statutory penalties, resulting in a maximum possible penalty of 20 years in prison. Richards' conviction was based upon numerous postings on a child exploitation website that depicted prepubescent girls being tortured and raped by adult men. On September 5, 2018, this Court sentenced Richards to a term

of imprisonment of 230 months to be followed by a lifetime term of Supervised Release. His sentence was affirmed on appeal by the Sixth Circuit in Case No. 18-4222. Defendant has served 34 months of that sentence.

On May 15, 2020, Richards filed a motion with this Court asking that counsel be appointed to represent him for the purpose of a Compassionate Release motion. [R. 50]. Richards noted that he had applied for compassionate release with the Warden and his request was denied in April of 2020. [R. 50. PageID 389]. The Federal Public Defenders' Office was appointed to represent him on May 20, 2020. This motion followed.

## II. The Availability of Compassionate Release Pursuant to 18 U.S.C. § 3582(c)

A district court generally lacks authority to "modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). The compassionate-release statute, 18 U.S.C. § 3582(c)(1)(A), provides a limited exception to that general rule of finality in federal sentencing. It authorizes a district court to reduce a defendant's previously imposed term of imprisonment if the court determines either that "extraordinary and compelling reasons warrant such a reduction," or that the defendant is at least 70 years of age, has served at least 30 years in prison, and is not a danger to the community. 18 U.S.C. § 3582(c)(1)(A)(i) and (ii). The statute also provides, however, that any sentence reduction must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

In the Sentencing Reform Act of 1984, Congress directed the Sentencing Commission to promulgate policy statements concerning compassionate release. 28 U.S.C. § 994(a)(2)(C). It further specified that those policy statements "shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples," and that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t).

Before 2018, the compassionate-release statute authorized a district court to act only "upon motion of the Director of the [BOP]." 18 U.S.C. § 3582(c)(1)(A) (2012). In the First Step Act, Congress amended § 3582(c)(1)(A) to permit district courts to act "upon motion of the

defendant" in certain circumstances, thus removing BOP as the exclusive gatekeeper. Pub. L. No. 115-391, § 603(b)(1), 132 Stat. 5339. Although Congress modified the procedure for filing such motions, it did not modify the substantive criteria for granting relief. *United States v. Ruffin*, 978 F.3d 1000, 1004 (6th Cir. 2020). In particular, it preserved the preexisting requirement that any sentence reduction be "consistent with applicable policy statements" from the Sentencing Commission. 18 U.S.C. § 3582(c)(1)(A). As the movant, the inmate bears the burden to establish that he is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Commission issued the initial version of that policy statement in 2006, in U.S.S.G. § 1B1.13. See U.S.S.G. App. C. Amend. 683 (Nov. 1, 2006). It restated the statutory criteria for compassionate release, and added a requirement that the district court must find, before granting a reduction, that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). Thus, before a court may grant compassionate release, the movant must establish and the court must find each of the following three things: (1) that "extraordinary and compelling reasons" warrant the reduction; (2) that the "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)"; and (3) that the reduction is consistent with the Sentencing Commission's policy statement found in U.S.S.G. § 1B1.13, by, among other things, finding that the Section 3553(a) factors warrant the requested relief. 18 U.S.C. § 3582(c)(1)(A); U.S.S.G. § 1B1.13. If the defendant fails to satisfy any one of these three criteria, the court may not grant compassionate release. See generally, *United States v. Rodd*, 966 F.3d 740, 744-45 (8th Cir. 2020).

Shortly thereafter, to discharge its Congressional mandate to specify "what should be considered extraordinary and compelling reasons for sentence reduction," 28 U.S.C. § 994(t), the Commission promulgated Application Note 1 as commentary to U.S.S.G. § 1B1.13. See U.S.S.G. App. C. Amend. 698 (Nov. 1, 2007). There, it defined "extraordinary and compelling reasons." In its most recent iteration, those comprise only four sets of circumstances. The first

permits relief if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." U.S.S.G. § 1B1.13, cmt. n.1(A)(i). That standard is also met if the defendant is:

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13, cmt. n.1(A)(ii).

The Application Note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. U.S.S.G. § 1B1.13, cmt. n.1(B)-(C). Those were not at issue in this case. Finally, the Application Note recognizes the possibility that the BOP could identify "other reasons" that would constitute "extraordinary and compelling reasons," and thus request compassionate release. U.S.S.G. § 1B1.13, cmt. n.1(D).

The Commission's policy statement was last amended in November 2018, before the enactment of the First Step Act. In two respects the policy statement and its commentary continue to reflect the pre-First Step Act version of § 3582(c)(1)(A). First, in restating the statutory criteria for eligibility for compassionate release, the policy statement refers to a court acting "[u]pon motion of the Director of the [BOP]," without also mentioning that a defendant may now file a compassionate-release motion. U.S.S.G. § 1B1.13. Second, Application Note 4, which is entitled "Motion by the Director of the Bureau of Prisons," states that "[a] reduction under this policy statement may be granted only upon motion by the Director of the [BOP]." U.S.S.G. § 1B1.13 cmt. n.4.

### III. The Commission's policy statement set forth in U.S.S.G. § 1B1.13 binds district courts considering whether to grant compassionate release under 18 U.S.C. § 3582(c)(1)(A).

It is the government's position that the Commission's policy statement set forth in U.S.S.G. § 1B1.13 binds district courts considering whether to grant compassionate release under 18 U.S.C. § 3582(c)(1)(A). Notwithstanding the present prefatory "Upon motion of the Director of the Bureau of Prisons" language—which the Commission wrote at a time when Congress had authorized only the Bureau of Prisons ("BOP") to file such a motion—Section 1B1.13, as a whole, is an "applicable" policy statement, despite the outdated reference to the BOP.

"Applicable" means "capable of being applied"; "fit and right to be applied; or "affecting or relating to a particular . . . situation." Black's Law Dictionary (11th ed. 2019). Notwithstanding its initial textual clause, virtually all of Section 1B1.13 and its commentary— and certainly all of its substantive provisions—remain "capable of being applied," "fit and right to be applied," and "affect or relate" to all compassionate-release motions, including those filed by inmates. Section 1B1.13's substantive provisions, commentary, and definitions are all consistent with Section 3582(c)(1)(A), as amended by the First Step Act, and the amended statute does not add any substantive-criteria distinctions based on who files the motion. Nor does the First Step Act purport to expand the bases for compassionate release beyond the categories identified by the Commission in Application Note 1 of U.S.S.G. § 1B1.13. The substantive requirements may—and should—apply equally, regardless of the motion's filer. See, e.g., *United States v. Bell*, 823 F. App'x 283, 284 (5th Cir. 2020) (per curiam) (treating § 1B1.13 as applicable to defendant-filed motions; *United States v. Saldana*, 807 F. App'x 816, 819-20 (10th Cir. 2020) (same); *United States v. Doe*, 2020 WL 6328203, at *1 (3d Cir. Oct. 29, 2020) (per curiam) (same). This includes Application Note 1(D); either an inmate or the BOP can base a compassionate-release motion on any additional BOP-identified criteria, and the district courts can apply that criteria in the same manner, regardless of the filer.

The Commission's title to U.S.S.G. § 1B1.13—"Reduction In Term of Imprisonment Under 18 U.SC. § 3582(c)(1)(A) (Policy Statement)"—further supports its application to both BOP-filed and inmate-filed motions.  As written, the policy statement's title applies to "any" compassionate-release reduction; it is not limited exclusively to those brought by BOP.  Indeed, in 2016, the Commission amended the title to its present state, striking the portion that stated "as a Result of Motion by Director of Bureau of Prison," and inserting instead "Under 18 U.S.C. § 3582(c)(1)(A)."  See U.S.S.G. App. C. Amend. 799 (Nov. 1, 2016).

Treating Section 1B1.13 as applicable to all compassionate-release motions is also consistent with the "substantial role Congress gave the Commission with respect to sentence-modification proceedings."  *Dillon v. United States*, 560 U.S. 817, 826 (2010).  And it is consistent with the "backdrop of existing law" against which Congress legislated.  *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1890 (2019) (cleaned up).

Moreover, even if the prefatory Bureau-of-Prisons-motion phrase did somehow render the Guideline provision, as a whole, inapplicable to inmate-filed motions, the Commission's "extraordinary and compelling reasons" definition in Application Note 1 remains applicable independently and retains its binding force.  See *Dillon, 560 U.S.* at 826 (the phrase "consistent with applicable policy statements issued by the Sentencing Commission" makes such policy statements binding on the courts); U.S.S.G. § 1B1.7 (generally treating commentary as equivalent to policy statements).  The Commission drafted Application Note 1 in filer-neutral terms; it does not contain any reference to acting on motion filed by BOP.  It is the Commission's definition of "extraordinary and compelling reasons," specifically implementing Congress's directive in 28 U.S.C. § 994(t) to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."  Had Congress wished to vest additional authority in the district courts to define their own "extraordinary and compelling reasons," it could have done so when it procedurally modified Section 3582(c)(1)(A) through the First Step Act.  It, however, did not.  Instead, it left Section 994(t) intact.  Thus, at a minimum, Application Note 1 remains binding.

The foregoing reading comports with logic and common sense. The compassionate release statute is part of an intricate sentencing scheme. The 1984 sentencing reform of which Section 3582 and Section 994 are part was driven by the Congressional determination "that sentencing in the Federal courts is characterized by unwarranted disparity and by uncertainty about the length of time offenders will serve in prison." S. Rep. No. 98-225, at 49 (1983). Congress thus created the Sentencing Commission to "provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices . . . ." 28 U.S.C. § 991(b)(1)(B). See also *Peugh v. United States*, 569 U.S. 530, 535 (2013); *United States v. Booker*, 543 U.S. 220, 264 (2005) (majority opinion of Breyer, J.).

Thus, the Sentencing Reform Act calls for consistent sentencing, and provides extremely limited grounds for later altering a sentence, as described in Section 3582(c). Allowing courts to determine their own extraordinary and compelling reasons would mark a profound alteration of the sentencing scheme that Congress carefully designed. It would afford individual judges the authority to, in effect, exercise a parole power that Congress specifically abolished in 1984, or exercise a clemency function that the Constitution affords exclusively to the President. See U.S. Const., Art. II, § 2, cl. 1. A judge could, for instance, initially impose a mandatory sentence as dictated by Congress, and then after the judgment became final, act to reduce it upon a declaration that the sentence in that particular case was "extraordinary" and unwarranted. This not only would effectively neutralize both Congress's authority to prescribe minimum terms and the Executive's authority to enforce them, but also would inevitably result in wildly varying results from different courts, demolishing the certainty and consistency in sentencing that Congress sought in enacting the Sentencing Reform Act. That course would also undermine the finality of sentences, "which is essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989).

In short, in passing the First Step Act, Congress sought to expand access to and expedite compassionate release. It did so by ensuring that inmates could file their applications even without Bureau of Prisons approval. But it does not follow that, by improving procedural access, Congress also intended to give courts a novel, expansive, substantive parole authority without saying so expressly. See *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("[Congress] does not, one might say, hide elephants in mouseholes."). It is "unlikely that Congress sought to substantially depart, without saying so, from otherwise settled presumptions regarding the resentencing context." *United States v. Martin*, 974 F.3d 124, 139 (2d Cir. 2020). Rather, "it is more likely that Congress was adopting, rather than departing from, established assumptions about how our legal . . . system works." Id. at 140 (quotation marks omitted).

**IV.** ***United States v. Jones*, -- F.3d --, 2020 WL 6817488 (6th Cir. Nov. 20, 2020).**

In making this argument, the government acknowledges the recent published panel opinion in *United States v. Jones*, -- F.3d --, 2020 WL 6817488 (6th Cir. Nov. 20, 2020). There, while acknowledging that the First Step Act only modified the process for obtaining compassionate release, *id*. at *7, rather than the substantive criteria, a split panel held that, because the Sentencing Commission (currently lacking a quorum) has not updated § 1B1.13 since the First Step Act's passage, it is not an "applicable" policy statement within the meaning of § 3582(c) for inmate-filed motions. *Id.* It remains applicable, however, for motions filed by BOP. *Id*. at *8. As such, the *Jones* Court concluded that, when an inmate files the motion, district judges need not "find that a reduction is consistent with applicable policy statements issued by the Sentencing Commission," and instead "have full discretion to define 'extraordinary and compelling' without consulting the policy statement § 1B1.13." *Id.* at *9.

This portion of *Jones*, however, was *dicta*. Accordingly, the government does not believe that it binds future panels. As Judge Cook's concurring opinion noted, the majority's discussion of § 1B1.13's applicability was unnecessary to the outcome of the case, which hinged on whether the district court properly exercised its discretion to deny relief after weighing the § 3553(a) factors. *Id.* at *13 (Cook, J., concurring in the judgment). Indeed, the district court in *Jones* had

assumed that extraordinary and compelling reasons existed, making the applicability of the §

1B1.13 definitions irrelevant. Notably, an earlier panel of this Court previously stated that the

Court need not address the question of § 1B1.13's applicability when it can affirm a district

court's denial of compassionate release based on its discretionary assessment of the Section

3553(a) factors. *Ruffin*, 978 F.3d at 1006. Because the majority's discussion in *Jones* therefore

did not "contribute to the judgment," *Wright v. Spaulding*, 939 F.3d 695, 701 (6th Cir. 2019), a

future panel would be justified in treating it as *dicta*. *See also*, *e.g.*, *United States v. Hardin*, 539

F.3d 404, 410-11 (6th Cir. 2008) ("language" in prior opinion "was not necessary to the

determination of the issue on appeal" and was therefore *dicta*); *cf. American Civil Liberties

Union of N.J. ex rel. Lander v. Schundler*, 168 F.3d 92, 98 n.6 (3d Cir. 1999) (Alito, J.)

(explaining that the "tradition of treating prior panel decisions as binding is closely tied to the

rules and procedures regarding rehearing *en banc*" since "the standards for rehearing *en banc*

look to the panel's *decision*, not to the panel's dicta") (emphasis in original).

That said, the government acknowledges that *Jones* itself described this portion of its

opinion as a holding on an issue that was necessary to reach. *See*, *e.g.*, *Jones*, 2020 WL

6817488, at \*1, \*7, \*8 n.19. In the event that the Court treats this aspect of *Jones* as binding, the

government maintains that *Jones*'s reasoning on this point was erroneous for the reasons stated

above and preserves such objection for further review.

## V.      Richards' stated reasons for his motion do not qualify as "extraordinary" or "compelling" under either the Guideline Policy Statement or, independently, under 18 U.S.C. § 3582(c)(1)(A)'s statutory language

Regardless of whether *Jones'* statements about U.S.S.G. § 1B1.13 had been essential to

its decision (thus binding on other panels) or not, Richards' stated reasons for his motion do not

qualify as "extraordinary" or "compelling" under either the Guideline Policy Statement or,

independently, under 18 U.S.C. § 3582(c)(1)(A)'s statutory language. Indeed, even if Section

1B1.13 does not formally bind courts, it nonetheless provides useful guidance in defining these

statutory terms. *See United States v. Gunn*, 2020 WL 6813995, at \*2 (7th Cir. Nov. 20, 2020)

(holding that U.S.S.G. § 1B1.13 is inapplicable to inmate-filed motions, but stating that it

nonetheless constitutes a "working definition" that can "guide [the district court's] discretion without being conclusive").

### A.    Efforts Taken by the Bureau of Prisons (BOP) to Combat COVID-19

There is no dispute that COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, the BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp. (last checked 12/9/20).

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a multi-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

BOP's operations are presently governed by Phase Nine of the Action Plan last updated on November 25, 2020. (See https://www.bop.gov/coronavirus/covid19_status.jsp). The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened by medical staff for COVID-19 symptoms, including a temperature check, and an approved viral PCR test. Inmates that arrive symptomatic and/or test positive are placed in medical isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. Inmates that arrive asymptomatic and test negative are placed in quarantine for at least 14 days. In addition to screening and testing inmates, temperature checks and COVID-19 screening is being conducted for staff, contractors, and other visitors to the correctional institutions, with those who register a temperature of 100.4° Fahrenheit or higher denied access to the building. As much as possible, staff are being assigned to the same posts and not rotating, as an additional measure to mitigate the spread of the virus.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, but the policy was recently modified to accommodate social visits where it is possible to maintain the safety of the staff, inmates, visitors, and the community.  In order to ensure that familial relationships are maintained throughout this disruption, BOP increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP.  Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. The total number of inmates placed in home confinement from March 26, 2020 to the present (including inmates who have

completed service of their sentence) is 18,547. [*See* Federal Bureau of Prisons, *COVID-19 Home Confinement Information*, *at* https://www.bop.gov/coronavirus/].

Taken together, these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately, some inmates have become ill, and more will likely become ill in the weeks ahead. As of the filing of this motion, the BOP has 124,616 federal inmates in BOP managed institutions and 13,909 in community-based facilities. The BOP has approximately 36,000 staff members. There are 6,440 federal inmates and 1,647 BOP staff who have confirmed positive test results for COVID-19 nationwide. Currently, 22,724 inmates and 2,142 staff have recovered. There have been 153 federal inmate deaths and 2 BOP staff member deaths attributed to the COVID-19 disease. Of the inmate deaths, 4 occurred while on home confinement. FCI Elkton currently has 3 inmates and 16 staff with positive tests. 896 inmates have tested positive and recovered from the virus. 9 inmates have died at Elkton. (*See* https://www.bop.gov/coronavirus/index.jsp)

However, BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

## VI.  Defendant's Conviction and Request for a Sentence Reduction

### A.  Offense Conduct

In October 2016, HSI Phoenix Special Agents became involved in an ongoing child pornography investigation with investigators from the New Zealand Department of Internal Affairs, Te Tari Taiwheuna, Digital Child Exploitation Team (NZDCET).  The investigation involved multiple individuals residing in the United States as well as other countries who utilized an Internet based website known as "Chatstep" (the "website") to distribute and/or collect image and video files depicting the sexual exploitation of children.  The website operated an anonymous online network allowing users to post images and videos directly to the site, or post hyperlinks that directed users to files stored elsewhere on the Internet in multiple chat rooms. Topics discussed in the chat rooms included users' distributing techniques and methods to mask their true identity, as well as methods to circumnavigate the website's reporting protocols in order to distribute and/or collect child exploitation material.

Beginning in October of 2016, investigators entered the chat rooms on this website and captured screenshots of the activities occurring in them.  Investigators noted that the vast majority of individuals who were in the chat rooms on the website would send messages about abusing children as well as post URLs to child pornography that were stored elsewhere on the Internet.  Because of this investigation, agents were able to identify David Richards, who was using the names: "ShesTen" and "KydKnnt" in the chat rooms.

On October 24, 2017, investigators observed Richards post a URL that directed others to an image file that depicted an early pubescent female performing oral sex on an adult male. Other website users also posted child pornography in the chat.  Subsequent monitoring of the website revealed several other instances where Richards posted links to sexually explicit images

involving minors.  For example, on October 25, 2017, Richards posted a URL to twenty-one (21) image files of child pornography, including a file that depicted a naked prepubescent female, with the word "Maxxx" written across her stomach in black ink, lying on her back while an adult male vaginally rapes her.   Then on October 31, 2017, Richards posted a URL to seven (7) files of child pornography.

On February 21, 2018, a search warrant was executed at Richards' home.  Homeland Security agents seized an HP Pavilion Desktop computer, a Lenovo Laptop computer, and a Samsung Galaxy S6 cellphone.  The desktop computer was forensically previewed on scene and found to contain sixty-nine (69) image files and one (1) video file depicting child pornography. The images depicted toddler to early aged female children (with the majority of the files depicting early prepubescent/grade school age children) engaged in oral to genital, genital to genital, and genital to anal sexual intercourse with adult males and females.  One of the images depicted a naked toddler lying on her back with her legs spread exposing her genitals and anus to the camera, while her arms were secured above her head with white cloth tied to each wrist.

Full forensics were conducted on a later date and revealed eighteen (18) video files and 342 image files on the desktop computer that depicted child pornography.  Thirteen (13) of the image files depicted children in bondage.  The Lenovo laptop computer revealed two (2) files depicting child pornography and a Yahoo Search Query "pedophiles are not child molesters" from August 21, 2015.

Richards was interviewed by HSI SA Guyton and stated he had been utilizing this website for approximately (2) years and would search for nudist material involving female children between the ages of 6 and 12.  He said he began viewing child pornography approximately fifteen (15) years ago and admitted to masturbating to these images approximately

nine (9) out of ten (10) times he viewed them. Richards stated he also used the chat application "ChatIW" to search for child pornography. He stated that in the past he had child pornography on thumb drives but that he deleted it all. Richards stated that while on Chatstep, he would join the chatrooms "Nudist Chat" and "Family Chat", where users discussed "being with" young children, and that he sometimes engaged in these discussions.

Richards also admitted that in August of 2012, Ohio Internet Crimes Against Children ("ICAC") executed a search warrant at his residence. The investigation was prompted by his activity on the website "imgsrc.ru". According to Richards, someone on the imgsrc.ru website sent him an email with a picture of a child (not child pornography) and wanted him to "tribute it" (meaning to ejaculate on the image, take a picture, and send it back). Richards claimed he did not comply with the request and deleted his account on the website. He said ICAC did not find anything on his devices and he was not charged. However, since that encounter, he had been searching for and looking at child pornography.

Following Richards' interview with SA Guyton, he agreed to participate in a polygraph examination with FBI SA Lance Fragomeli. During the pre-test interview, Richards provided the following interview statement:

*In reference to sexual contact with minors when I was in the United States Navy (USN), I had a port call in the Philippines. I was in my mid/ late twenties and assigned to the USS Coral Sea, an aircraft carrier. During this port call, I paid a 12-14 year-old Philippine girl to expose her breast. I then masturbated onto the girl and myself. During the same port call, I paid another 12-14 year-old Philippine girl for sexual intercourse. None of my sexual contact with these minors was nonconsensual.*

*In the early 80s, when my [relative], was approximately 5 years-old, I took her to a public swimming pool in Pittsburgh, PA. During this pool visit, I befriend a 12-14 year-old female and told her I could teach her to swim. During the course of my instruction, I purposely touched her breasts and buttock. It is possible I used this contact for later masturbation purposes. I recall years later, I was swimming in a metro park lake in Cleveland and befriended another 12-14 year-old female. During our horseplay, I purposely touched her breasts. It is possible I used this contact for later masturbation purposes.*

*In 2002/2003 when [relative] was in 8th grade, I was Church Council President at the St. Mark Lutheran Church located in Cleveland, Ohio. During a volleyball trip when I was transporting [relative] and four other girls, we stopped at a McDonald to get food. I was sexually attracted to one of the 13 year-old girls, name unrecalled. When the food was ready, I touch this 13 year-old girl's arm and gently guided her back into the restaurant. When I was physically touching her arm, I did have sexual thoughts about her. This girl later claimed that I had inappropriately touched her. I spoke with the school principal, an unrecalled female, and explained the situation of guiding the girls back inside. At a later time while at church, I did accidently bump into this same 13 year-old female who again made another complaint about me. The pastor and the same principle spoke with me about the complaint. I was later removed as the President of the Church council. I then removed [relative] from the school and have never returned to that church.*

*Prior to 2005 when I had that GSI incident, my [relative] would bring over girl friends to our residence. At times, I did find some of these girls to be sexually attractive and did use them for masturbatory fantasies purposes. I estimated I masturbated no more than 50 times to various friends of [relative] prior to 2005.*

*I am sexually attracted to female minors and female adults. Pertaining to female minors, my sexual preference is for girls between the ages of 6 to 12 years-old and for adult women, under 40 years-old. I realized in my early twenties that I was sexually attracted to both female minors and adults.*

*In reference to Child pornography (CP), I have been viewing and trading CP through ChatIW and Chatstep. I estimate that I currently have saved about 100 images of CP and one CP video on my desktop computer in the pictures folder. At times, I do masturbate when I view CP images and videos.*

Richards was then asked: (A) "Have you ever had any sexual contact with a child? (Answer: No); and (B) Have you ever participated in any sexual activity with a child? (Answer: No). During the post-test interview, Richards provided the following written statement concerning his response to the relevant question:

*During the examination, I recalled in the 90's, I was in a mall in Hampton, Virginia. I was wearing shorts with no underwear which is usual for me. I did this because it was naughty and it kinda of gave me a thrill. Someone in the mall made a complaint that I had shown my genitals to some children. It is possible that some child could have seen my genitals protruding from my shorts. It is also possible that I had an erection at that time; however, I cannot specifically remember. I was interviewed by the police, nothing happened except that I was banned from that mall for life.*

PRIOR CONVICTION

In 2006, Richards was convicted in the Cuyahoga County Court of Common Pleas, Case No. CR 463480, of two counts of Gross Sexual Imposition (F-4) and four counts of Sexual Imposition (M-3). The original Indictment charged Richards with thirty-six (36) counts of Gross

Sexual Imposition between 1996 and 2002 (from the language of the Indictment – a violation of O.R.C. 2907.05(A)(4), an offense against a person less than 13 years of age). It also charged him with four (4) counts of Gross Sexual Imposition (from the language of the Indictment – a violation of O.R.C. 2907.05(A)(4), an offense against a person less than 13 years of age) against minors born in 1984, 1977, 1973, and 1986. At the change of plea hearing, the State of Ohio amended Counts 1 and 40 of the Indictment by deleting the language "under 13 years of age," and amending Counts 2, 37, 38, 39 to O.R.C. 2907.06(a)(4), Sexual Imposition, a misdemeanor of the 3rd degree. Richards was sentenced to an aggregate prison term of 17 months and Community Control for 5 years. The plea covered four (4) separate minor victims. Richards was also required to register as a sex offender until July 2017.

### B.    Richards' Sentence

Richards' Presentence Report indicated he had acid reflux/GERD his entire life but had no other physical health problems. [R. 22: Sealed PSR, PageID 91]. Richards reported a prior diagnosis of depression and anxiety by the Veterans Administration and received medication. [Id.].

At the sentencing hearing on September 5, 2018, this Court adopted the advisory Guidelines calculations stipulated to in the Plea Agreement and further found that the a five (5) level enhancement applied for pattern of activity, based upon Richards' prior sexual offenses. Richards was found by this Court to be an Offense Level 39, after acceptance, and a Criminal History Category II. [R. 44: Sentencing Trans., PageID 296]. This resulted in an advisory Guidelines Range of 240 months (the maximum statutory penalty). [Id.] This Court carefully considered the Defendant's history and characteristics, as well as the other 18 U.S.C. §3553(a) factors at the time of sentencing and imposed a prison term of 230 months followed by lifetime Supervised Release.

Richards is currently serving his sentence at FCI Elkton in Ohio. This is a low security facility with an adjacent low security satellite prison that currently houses a total of 1,454

inmates.  Richards is housed in the satellite building that houses 339 inmates.  Richards' medical records from Elkton reference his Hyperlipidemia (unspecified), major depressive disorder, gastro-esophageal reflux disease and disorder of the bone (unspecified).  He is receiving medical care at the institution and his conditions are managed.  The records also indicate monthly negative COVID-19 tests.

**VII.   Richards' Motion for Compassionate Release Should Be Denied**

This Court should deny Defendant's motion for a reduction in his sentence as Richards has (1) failed to establish that "extraordinary and compelling reasons" support a sentence reduction; and (2) he is a danger to the safety of the community and the § 3553(a) factors do not warrant his release.

The Centers for Disease Control and Prevention (CDC) publish a list of underlying medical conditions that pose an increased risk for severe illness from the virus that causes COVID-19.  [*See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html]  These include cancer, chronic kidney disease, heart conditions, pregnancy, type 2 diabetes, and other named conditions.  Richards has not been diagnosed with any of the conditions on the list.  The CDC also lists a series of conditions that **might** pose an increased risk for severe illness from COVID-19, to include asthma, cystic fibrosis, hypertension, liver disease, pulmonary fibrosis, overweight (>24 kg/m2 but < 30 kg/m2), and other listed conditions.  Defendant asserts that his medical conditions place him in the high-risk category but none of his documented medical conditions actually fall on the CDC high-risk list.  Further, Richards argues that he has a body mass index (BMI) of 29.3[1], which would place Richards in the second category of persons with a condition that **might** pose an increased risk of severe illness from COVID-19.  Therefore, the Government submits that Richards has failed to establish that he is in the increased risk category.

---

[1] Elkton medical records from January 24, 2020 list Richards at 241 pounds and 76" (6'3") tall.  This is approximately 15 pounds lighter than his listed weight in the PSR (255 lbs).

Second, this Court must consider all pertinent circumstances, including the 3553(a) factors, and possible danger to the community.  Under the applicable policy statement, this Court must deny a sentence reduction unless it determines the defendant "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2). Additionally, this Court must consider the § 3553(a) factors, as "applicable," as part of its analysis. *See* § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020).

Here, Richards would pose a danger to public safety if released. This Court should deny a sentence reduction on that basis alone.  Richards is a repeat sex offender with an obvious attraction to prepubescent girls.  Using the internet, he was able to access a website that catered to his need for sexually explicit material involving young girls.  Some of the images depicted bondage and torture.  Richards now asks this Court to reduce his sentence so that he can be back in the community where every child in America is spending the vast majority of their day on the internet.  Probation and parole officers are stretched to the max in an effort to supervise a mushroom cloud of new releases, placing them in more houses (or not able to physically supervise at all) during a global pandemic.  In addition, the oversight for Electronic Service Providers (ESP) is stretched threadbare because most of those individuals are working from home or furloughed.  *See* Attachment A (News article).  Furthermore, Richards has not participated in sex offender treatment, because he is only 34 months into his 230 month sentence.

Moreover, the issue with recidivism particularly in child pornography cases is whether an individual with a sexual attraction to children can, or ever, be rehabilitated.  The Sixth Circuit Court of Appeals as well as Congress have recognized that sex offenders unfortunately have a high rate of recidivism.  As emphasized in *Richardson*, there are, "long-standing concerns of Federal judges and prosecutors regarding the inadequacy of the existing supervision periods for sex offenders, particularly for the perpetrators of child abuse crimes, whose criminal conduct may reflect deep-seated aberrant sexual disorders that are not likely to disappear within a few years of release from prison." *United States v. Richardson*, 349 Fed. Appx. 38, 44 (6th Cir. 2009) (quoting H.R.Rep. No. 108-66, at 49–50 (203) (Conf.Rep.), *reprinted in* 2003 U.S.C.C.A.N. 683,

684). If this concern remains present post-sentence, it certainly remains true for Richards who has served only 34 months of a 230 month sentence.

Accordingly, this Court should deny the motion for a sentence reduction.

Respectfully submitted,

Justin E. Herdman
United States Attorney

By: _/s/ Carol M. Skutnik_
Carol M. Skutnik (OH 0059704)
Assistant United States Attorney
United States Court House
801 W. Superior Avenue, Suite 400
Cleveland, Ohio 44113
(216) 622-3785 (phone)
(216) 522-8355 (fax)
Carol.Skutnik@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2020, a copy of the foregoing document was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

/s/ Carol M. Skutnik
Carol M. Skutnik (0059704)
Assistant U.S. Attorney